IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Cadence Bank, N.A., | ) | Civil Action No.: 4:10-cv-2717-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Horry Properties, LLC, a South Carolina | ) | **FINDINGS OF FACT,** |
| Limited Liability Company; M&M | ) | **CONCLUSIONS OF LAW,** |
| Builders, LLC of OD, a South Carolina | ) | **AND ORDER** |
| Limited Liability Company; Arthur F. | ) | |
| McLean, Jr., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court following a bench trial held on January 30, 2012. Having considered the testimony of the witnesses, both in-court and by way of deposition, the exhibits, and arguments of counsel, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

As discussed more fully below, the Court finds in favor of Cadence Bank, N.A. ("Cadence Bank") on its claim that Defendant Horry Properties, LLC ("Horry Properties") fraudulently transferred certain property and assigned leases associated with that property to Defendant M&M Builders, LLC of OD ("M&M Builders"), and the challenged transfer and assignments are set aside as utterly void. However, the Court finds in favor of Defendants on Cadence Bank's claim to pierce the corporate veils of Horry Properties and M&M Builders, and the Court will not disregard the corporate forms of Horry Properties or M&M Builders.[1]

---

[1] At the conclusion of the case, and after all the evidence was presented, Defense counsel made a motion for judgment as a matter of law on Plaintiff's fraudulent transfer claim and veil

## Background

This lawsuit is an attempt by Cadence Bank to set aside an alleged fraudulent conveyance of a parcel of property and assignment of two leases associated with the property between Horry Properties and M&M Builders, which were both allege dly controlled by Defendant Arthur F. McLean ("Mr. McLean"). Cadence Bank, alternatively, seeks actual and punitive damages against Mr. McLean, Horry Properties, and M&M Builders for damages caused by their alleged fraudulent conduct. Specifically, Cadence Bank contends that after foreclosure proceedings were instituted against Horry Properties in North Carolina, Mr. McLean transferred Horry Properties' primary asset to M&M Builders in an attempt to prevent Cadence Bank from collecting on any deficiency from the North Carolina foreclosure.

Cadence Bank also seeks to disregard the corporate forms of Horry Properties and M&M Builders, arguing that Mr. McLean has abused the corporate form to such an extent and degree that principles of equity and fairness require the corporate veil to be pierced as to both entities.

## Procedural History

Cadence Bank filed this lawsuit on October 10, 2010, alleging causes of action against Horry

---

piercing claim. [Tr., Doc. # 61, at 200:8–201:5, 204:2–6, 206:23–207:2.] The Court took these Motions and the case under advisement. A motion for judgment as a matter of law is made under Federal Rule of Civil Procedure 50, which applies in jury trials. The proper motion in a non-jury trial is a Rule 52(c) motion for judgment on partial findings, and the Court will construe Defendants' Motions as such. Defendants' Motion as to the first cause of action of fraudulent transfer is DENIED as set forth in the Findings of Fact and Conclusions of Law. Further, after reviewing all the evidence presented in the case, Defendants' Motion as to the second cause of action for piercing the corporate veil is GRANTED for reasons in addition to those raised by Defense counsel and as set forth in the Findings of Fact and Conclusions of Law.

Properties, M&M Builders, and Mr. McLean.[2] [Pl.'s Compl., Doc. # 1.] In its first cause of action, Cadence Bank alleges that after it instituted a foreclosure proceeding against Horry Properties, Horry Properties conveyed its primary asset to M&M Builders. [Pl.'s Compl., Doc. # 1, at ¶¶ 8–21, 23–30.] In addition to the transfer of land, Horry Properties assigned two leases associated with the property to M&M Builders. [*Id.* at ¶ 27.] Cadence Bank alleges that Mr. McLean was the sole member and manager of both M&M Builders and Horry Properties at the time of the conveyances and that the transactions between Horry Properties and M&M Builders were conducted by Mr. McLean with the intent to defraud Cadence Bank. [*Id.* at ¶ 28.] Based on the alleged fraudulent conduct, Cadence Bank seeks to set aside the transfers under S.C. Code Ann. § 27-23-10(A). [*Id.* at ¶ 30.] In the alternative, Cadence Bank requests actual and punitive damages. [*Id.* at ¶¶ 32–33.]

In its second cause of action, Cadence Bank seeks declaratory relief under 28 U.S.C. §§ 2201–2202. [*Id.* at ¶¶ 35–36.] Cadence Bank contends that because Mr. McLean abused the corporate form to defraud creditors, the corporate veil should be pierced as to both M&M Builders and Horry Properties. [*Id.* at ¶ 35.] Cadence Bank requests that the Court set aside the corporate entities known as Horry Properties, LLC and M&M Builders, LLC of OD, and hold Mr. McLean personally liable for the LLCs' debts and obligations. [*Id.* at ¶ 36.]

Mr. McLean, Horry Properties, and M&M Builders filed their answer on October 28, 2010. [Answer, Doc. # 22.] Defendants deny that the transfers were conducted with the intent to defraud Cadence Bank and argue that Cadence Bank should be estopped from seeking the requested relief

---

[2] Cadence Bank also named Beach First National Bank and Horry County State Bank as defendants in this action. [Pl.'s Compl., Doc. # 1.] On November 18, 2010, Cadence Bank consented to the dismissal, without prejudice, of Horry County State Bank from this case. [Stipulation of Dismissal, Doc. # 17.] On October 13, 2011, Cadence Bank consented to the dismissal, with prejudice, of Beach First National Bank. [Stipulation of Dismissal, Doc. # 39.]

because: 1) the actual fair market value of the property received by Cadence Bank following the foreclosure sale exceeds the amount of Horry Properties' debt; 2) Cadence Bank failed to provide notice of the foreclosure sale to Arthur and Elizabeth McLean as guarantors of the North Carolina mortgage; and 3) Cadence Bank acted with full knowledge of the corporate structure of Horry Properties. [*Id.* at ¶¶ 13, 6–19.]

## **Findings of Fact**

Parties

1.     Plaintiff Cadence Bank, formerly known as Seasons Bank,[3] is a banking institution chartered by the Office of the Comptroller of the Currency, an agency in the United States Treasury Department, pursuant to the National Bank Act.  Cadence Bank has its headquarters in Starkville, Mississippi. [Pl.'s Compl., Doc. # 1–4, at ¶ 1; Defs.' Answer, Doc. # 22, at ¶ 2.]

2.     Defendant Horry Properties is a South Carolina Limited Company organized in 1998. [*Id.*]

3.     Defendant M&M Builders is a South Carolina Limited Liability Company organized in 2006. [*Id.*]

4.     Defendant Mr. McLean is a citizen and resident of Horry County, South Carolina. [*Id.*] Mr. McLean has been in the real estate business for at least fifty years, and has sold more than 100

---

[3] Until a sale and merger on November 14, 2007, Plaintiff was known as Seasons Bank. [Tr., Doc. # 61, at 44:20–45:22.] Accordingly, all exhibits reflecting transactions between Plaintiff and any of the Defendants prior to that date bear the name Seasons Bank. It is undisputed that Seasons Bank, as referenced during trial and reflected on the exhibits dated prior to November 14, 2007, and Cadence Bank, as referenced during trial and reflected on the exhibits dated subsequent to November 14, 2007, are the same entity. [*See* Tr. at 169:12–22.] Accordingly, for ease of reference, this Court will refer to Plaintiff as Cadence Bank throughout this Order.

properties. [Tr.[4] at 75:5–11.]

<u>Mr. McLean's interest in Horry Properties and M&M Builders</u>

5.      Mr. McLean was the sole member and manager of Horry Properties and at least the "owner-manager," if not the sole member, of M&M Builders at the time of the challenged conveyances. [*See* CBE[5] 1, 9, 16, 55, 77; Tr. at 80:5–10, 101:12–17.]

6.      Mr. McLean does not dispute his status as sole member of Horry Properties. [*See* Tr. at 80:5–10; 101:12–17.] Regardless, the evidence also supports this finding. [*See id*.] However, Mr. McLean has claimed that he transferred all of his interest in M&M Builders to his children, Lance McLean and Jo Anne McLean, on or about February 2, 2008, and that he was merely acting as "owner-manager" on his children's behalf. [*See* CBE 55 at 1; Tr. at 99:4–22.] In several exhibits submitted to this Court, Mr. McLean held himself out to the public as the sole member of M&M Builders; Mr. McLean acknowledged that in the documents outlining the transactions at issue, he signed as the sole member of both Horry Properties and M&M Builders; and Mr. McLean conceded that his children never complied with the requirements of M&M's operating agreement regarding the addition of new members. [*See, e.g.*, CBE 1, 9, 16; Tr. at 99:24–101:23.] Regardless of whether he was the sole member or "owner-manager" of M&M Builders, he exercised exclusive control over the affairs of M&M Builders.[6]

---

[4] The transcript of this trial, which the Court references throughout this Order, is located at Doc. # 61.

[5] At the trial of this case, Cadence Bank introduced various exhibits ["CBE__"], as did Defendants ["HPE__"], which the Court will refer to throughout this Order.

[6] Many documents in the record signed by Mr. McLean after the purported February 2, 2008 transfer of M&M Builders to his children, including the challenged transfer and assignments at issue in this case, bear Mr. McLean's name and signature as either "member" or "sole member." [*See, e.g.*, CBE 1, 5, 9, 16, 51.]

<u>Basis for Horry Properties' indebtedness to Cadence Bank</u>

7.      On or about June 20, 2005, Horry Properties, by and through its sole member and manager Mr. McLean, executed and delivered a promissory note promising to pay Cadence Bank the principal sum of $816,355.00 ("Cadence Note"), in exchange for a loan from Cadence in that amount. [CBE 74; Tr. at 13:1– 22, 76:1–22.] The purpose of the loan was to purchase an adjacent bakery and combine it with an existing restaurant known as the Country Cottage. [*Id*.]

8.      The Cadence Note was secured by a Deed of Trust on certain real estate located in Clay County, North Carolina, and recorded in Book DT M8, Page 043 in the Clay County Registry. [CBE 94, Tr. 14:14–15:23, 77:7–78:2.] The property used as collateral for the loan from Cadence Bank is set forth in Schedule A of the Deed of Trust and includes the property on which the Country Cottage Restaurant and Bakery was located and twelve undeveloped/wilderness lots ("Country Cottage property and Undeveloped Lots"). [*Id*.] The Cadence Note was also personally guaranteed by Mr. McLean and his wife, Elizabeth McLean. [CBE 67.] In July of 2007, Cadence Bank granted Horry Properties and Mr. McLean an extension on the payment obligations required under the Cadence Note allowing them to miss payments due on June 27, 2007 and July 27, 2007. [CBE 75; Tr. 20:6–24, 79:18–80:4.]

9.      Horry Properties and Mr. McLean ultimately defaulted on the Cadence Note for failure to make monthly payments of principal and interest. [Tr. at 21:2–3, 81:13–19.]

10.     On May 7, 2008, Cadence Bank initiated foreclosure proceedings on the Country Cottage property and Undeveloped Lots in the Superior Court for Clay County, North Carolina, against Horry Properties for failure to meet its payment obligations under the Cadence Note. [CBE 82; Tr. at 24:16–25:12.]

Horry Properties' notice of foreclosure proceedings and sale

11.     The initial Notice of Hearing regarding the foreclosure action was served on the registered agent for Horry Properties, David Sowell, on June 10, 2008. [CBE 68–69, 79; Tr. at 24:16–25:5, 28:10–21.]

12.     Mr. Sowell testified that although he could not specifically remember being served documents relating to the foreclosure, he had been served other documents in the past and had no reason to believe that service of the foreclosure documents was not effectuated or that the documents evidencing service were not authentic. [Tr. at 67:5–13.]

13.     Mr. Sowell testified that it was his standard practice as registered agent to forward any documents to Mr. McLean, and that there was no reason to believe he did not do so regarding the foreclosure notice in the present case. [Tr. at 66:14–67:24.]

14.     Mr. McLean testified that on previous occasions, Mr. Sowell had delivered documents to him, and he also acknowledged that Mr. Sowell could have told him by telephone about the filed documents. [Tr. at 83:1–2, 82:22–24.]

15.     On June 30, 2008, an Order of Sale was issued authorizing the sale of the Country Cottage property and Undeveloped Lots. [CBE 83.] Importantly, the Order of Sale found that Horry Properties was indebted to Cadence Bank in the amount of $816,355.00. [*Id.*]

16.     On behalf of Horry Properties, a Notice of Appeal was filed on July 7, 2008, challenging the June 30, 2008 Order of Sale. [CBE 85.]

17.     Although the Notice of Appeal bore the name of David Sowell, both Mr. Sowell and Mr. McLean testified that they neither signed nor filed the Notice of Appeal. [Tr. at 68:9–23, 84:14–25.]

18.     Although the identity of the individual who filed the notice of appeal is in dispute, Cadence Bank's evidence supports that Mr. McLean attended the appeals hearing challenging the Order of Sale and there was insufficient evidence by Defendants to rebut this. [*See* Tr. at 199:1–13.]

19.     Mr. McLean testified that he "think[s]" he attended the foreclosure sale of the property on December 21, 2008. [CBE 91; Tr. at 86:2–3.] Additionally, a Cadence Bank representative testified that he spoke to Mr. McLean at the foreclosure sale. [Tr. at 199:2–4.]

20.     This Court finds that Horry Properties had notice of the foreclosure proceedings via the Notice of Hearing served upon its registered agent. This finding is supported by the certified mail receipts and an affidavit of service, which were provided by Cadence Bank, and the testimony of the witnesses, who did not challenge this service. [*See* CBE 69, 79.]

21.     This Court also finds that Mr. McLean had notice of the foreclosure proceedings. Mr. McLean's testimony that he was personally unaware of the foreclosure action on August 22, 2008, the date of the last challenged conveyance at issue, is neither credible nor supported by the evidence. An appeal of the Order of Sale was filed on behalf of Horry Properties prior to August 22, 2008, and Mr. McLean managed to attend both the appeal of the Order of Sale and the foreclosure sale shortly after that date. [*See* CBE 85, 91; Tr. at 86:2–3, 199:1–13.] Additionally, the Deed of Trust contemplated that failure to make payments on the Cadence Note would give Cadence Bank the right to bring a foreclosure action, and Mr. McLean admitted that because he had made no payments to Cadence Bank, he was aware that "[p]ossibly there was going to be a foreclosure." [CBE 94, at 6; Tr. at 138:4–20.]

Horry Properties' liability to Cadence Bank

22.     On December 29, 2008, after the Order of Sale was issued, appealed, and affirmed, the Country Cottage property and Undeveloped Lots were sold at auction for $450,000.00. [CBE 83, 85, 91]. The December 29, 2008 sale left an outstanding deficiency of $367,516.21. [*Id*.] Cadence Bank was the sole bidder at the foreclosure sale and their bid was based on appraisals they had obtained. [Findings of Fact ¶¶ 33–36; Tr. at 34:1–9.]

23.     The documents executed by Mr. McLean in connection with the loan clearly contemplated a foreclosure sale in the event of default and addressed the issue of liability for any deficiency following a foreclosure sale on the Country Cottage property and Undeveloped Lots. [CBE 94; Tr. at 16:6–13, 18:13–24.] Mr. McLean testified that he read and understood the terms of the agreement and indicated that he understood that Horry Properties would be liable for the deficiency following a foreclosure sale. [Tr. 78:3–79:14.]

24.     On August 17, 2009, Cadence Bank filed suit in the United States District Court for the Western District of North Carolina against Horry Properties, LLC, Arthur F. McLean, Jr., and Elizabeth A. McLean, Civil Action No.: 2:09-cv-44-MRH-DLH, to collect on the outstanding foreclosure deficiency of $367,516.21. [CBE 42.] On April 9, 2010, a default judgment was entered in favor of Plaintiff against Horry Properties in the amount of $367,881.21. [CBE 44.] The Judgment was domesticated in South Carolina on October 13, 2010. [CBE 43.] The judgment was filed in Horry County, South Carolina on November 17, 2010. [CBE 106.] A *Lis Pendens* providing notice of the instant case was filed in Horry County on September 1, 2011. [CBE 107.]

25.     Although Cadence Bank received a default judgment against Horry Properties in the North Carolina action, an attorney appeared for Mr. and Mrs. McLean. [*See* CBE 43; Tr. at 87:1–6, 88:3–10.]

26.     On December 30, 2010, Cadence Bank dismissed its claims against Mr. and Mrs. McLean with prejudice. [HPE 4.] During the testimony of Wallace Cade, Cadence Bank's representative, Mr. Cade did not elaborate as to why Cadence Bank chose to forever dismiss the personal guaranty claim against Mr. McLean, and declared that Cadence Bank "decided not to pursue [that claim]." [Tr. at 50:7–13.]

Depreciation of the Country Cottage property pledged as collateral

27.     The property listed in Schedule A of Deed of Trust included the Country Cottage property and Undeveloped Lots. [CBE 94, Tr. at 77:7–22.]

28.     In 2005, the Country Cottage Restaurant was an established, successful restaurant. [Tr. at 14:2–7.] In an appraisal of the restaurant dated May 27, 2005, the Country Cottage appraised for $600,000.00. [HPE 1; Tr. at 16:14–18.] The bakery appraised for $380,000.00, and the undeveloped lots appraised for $258,000.00. [HPE 2–3;Tr. at 17:1–4.]

29.     Because the Country Cottage Restaurant and Bakery was an established, profitable, and ongoing business in 2005, the 2005 appraisals utilized the income method taking the profitability of the business into account. [Tr. at 23:10–24:15.] As a result, in 2005, using the income method, the Country Cottage Restaurant and Bakery appraised for a total of $980,000.00. [*Id.*]

30.     In 2007, however, the Country Cottage Restaurant and Bakery began to falter as the economy began to decline and tourists stopped coming to the area. [Tr. at 167:3–168:17.] The

Country Cottage Bakery and Restaurant appraised for a total of $545,000.00 in November 2007. [CBE 108.]

31. By January 2008, the Country Cottage Restaurant and Bakery was closed for business. [Tr. at 24:9–15, 169:20–170:4.] As a result, by the time appraisals in October 2008 were performed, the Country Cottage Restaurant and Bakery were not appraised using the income method. [CBE 104; Tr. at 191:22–192:4.]

32. Photographs dated September 12, 2008, of the interior of the Country Cottage Restaurant, show the property to be in a state of disrepair. [CBE 112; Tr. 35:2–36:16.]

33. The end result was that in October 2008, the Country Cottage Restaurant and Bakery appraised for a total of $380,000.00. [CBE 104; Tr. at 22:16–19.] According to the appraisal, the "as-is" value[7] was $304,000.00. [CBE 104.]

Depreciation of the Undeveloped Lots pledged as collateral

34. With respect to the undeveloped/wilderness lots, the property values in Clay County, North Carolina began to decline in 2007. [Tr. at 23:10–19.] The undeveloped lots appraised for $258,000.00 in 2004, and $240,000.00 in November 2007. [CBE 105; Tr. at 17:10–13, 21:24–22:2, 34:10–17.] According to the appraisal, the "as-is" value for the undeveloped lots in November 2007 was $150,000.00. [Id.]

35. As stated above, Cadence Bank purchased the Country Cottage property and Undeveloped Lots at the foreclosure sale for $450,000.00. Cadence Bank arrived at the $450,000 sales/bid price by approximately combining the most recent "as-is" appraised values for the properties. [Tr. at 34:10–17.]

---

[7] The "as-is" value represented a "quick sale" of the property, or the value one might receive if they were under a "compulsion to sell" the property. [Tr. at 57:20–58:11.]

36.     The most recent "as is" value for the Country Cottage Restaurant and Bakery was $304,000.00. [CBE 104.] The most recent "as is" value for the undeveloped lots was $150,000.00. [CBE 105, at 10.]

37.     Following the purchase, Cadence Bank invested approximately $63,000.00 into the restaurant and bakery in order to make it suitable for resale. [Tr. 37:3–10.] After $63,000.00 in improvements, Cadence Bank was able to sell the Country Cottage Restaurant and Bakery for $250,000.00, almost $54,000.00 less than the stated "as is" appraised value. [Tr. at 37:14–16.] Cadence Bank received approximately $227,000 after commission. [*Id.*]

38.     Following the purchase of the undeveloped lots, Cadence Bank invested $33,000.00 to install a road so that the property could be sold. [Tr. at 37:19–25.] As of the date of trial, Cadence Bank had sold five of the twelve lots for a selling price of $4,500. [Tr. at 38:9–25.] A representative from Cadence Bank testified that Cadence Bank netted approximately $1,900 per lot. [*Id.*]

39.     As of the date of trial, Cadence Bank had recovered approximately $260,000.00 of the $450,000 it bid at the foreclosure sale. [Tr. at 38:24–25.]

40.     The Court, therefore, finds that the actual fair market value of the property received by Cadence Bank following the foreclosure sale, i.e. Country Cottage property and Undeveloped Lots, did not exceed the amount of Horry Properties' $816,355.00 debt to Cadence Bank. [*See* CBE 83.]

Challenged conveyances

41.     On August 8, 2008, Horry Properties, through its sole member, Mr. McLean, transferred to M&M Builders its only asset other than the Country Cottage property and Undeveloped Lots: a parcel of land, located in Horry County, South Carolina, and referenced on TMS Nos: 144-06-01-074, 144-06-01-075, and 144-06-01-076, (hereinafter referred to as the "KFC/Waffle

House property"). [CBE 1; Tr. at 94:19–25.] The stated consideration for the exchange was $882,500.00. [*Id*.] The Deed was executed by Mr. McLean, as sole member of Horry Properties, in favor of M&M Builders, of which Mr. McLean was acting as controlling agent. [*Id*.; Findings of Fact ¶¶ 5–6.]

42.     Mr. McLean executed a promissory note on behalf of M&M Builders in favor of Horry Properties in the amount of $499,115.70 ("M&M Note"). [CBE 51.] According to the M&M Note, M&M Builders promised to pay Horry Properties the sum of $499,115.70, with interest accruing at 6% per annum. [CBE 51.] No payments are due on the note until August 8, 2018, when principal and interest will become due in one lump sum. [CBE 51.]

43.     The legal description for the KFC/Waffle House is as follows:

> ALL that certain piece, parcel or tract of land situate, lying and being in the City of North Myrtle Beach, Little River Township, Horry County, South Carolina, containing 1.68 acres, more or less, and being identified as RESIDUAL AREA PARCEL "B" on a plat entitled "Eckerd Drug Store, Southstar Holdings - Myrtle I, LLC" prepared by Kyler W. Johnson, SC PLS # 16132, dated October 15, 1997, and recorded in the Office of the Register of Deeds for Horry County, South Carolina in Plat Book 152 at Page 205.
>
> TOGETHER with a non-exclusive easement for vehicular and pedestrian access and ingress and egress on, over and across the drive identified as "29' Access Easement" on the above referenced plat of record.
>
> THIS BEING the same property conveyed to Horry Properties, LLC by deed of The Legacy, dated November 1, 1999 and recorded November 1, 1999 in the Office of the Register of Deeds for Horry County, South Carolina in Deed Book 2203 at Page 583.

[CBE 1.]

44.     Also on August 8, 2008, M&M Builders, through Mr. McLean, executed a note and mortgage on the KFC/Waffle House in the amount of $125,000.00, in favor of Beach First National Bank. [CBE 2.]

45.     A settlement statement was prepared in connection with the transfer of the KFC/Waffle House and $125,000.00 loan by Beach First to M&M Builders. [CBE 16.] The statement shows the sales prices as $882,500.00.  [CBE 16.] Settlement charges to M&M Builders totaled $5,077.50. [*Id*.] The amounts paid by or on behalf of M&M Builders appear to include: 1) $125,000 loan from Beach First; 2) assumption of $321,155.50 in existing loans; and 3) $485,299.40 in seller financing. [*Id*.] The "seller financing" is the M&M Note – the $499,115.70 promissory note executed by M&M Builders in favor of Horry Properties on August 8, 2008. [*Id*., CBE 51; Tr. at 112:13–18.]  The settlement statement shows that M&M Builders, the grantee, received $43,877.40 in cash at the closing, while Horry Properties, the grantor, received no funds. [CBE 16; Tr. at 112:1–5.]

46.     On August 22, 2008, M&M Builders executed a note and mortgage in favor of Horry County State Bank on the KFC/Waffle House in the amount of $226,421.14, thereby assuming responsibility for an existing mortgage between Horry Properties and Horry County State Bank. [CBE 4, 17; Tr. at 110:2–11.]

47.     On August 22, 2008, Horry Properties, through its sole member Mr. McLean, assigned two leases associated with the KFC/Waffle House property to M&M Builders. [CBE 9.] The lease agreements produced an income stream for Horry Properties and were between Horry Properties and Waffle House, Inc., and Horry Properties and VIP of Myrtle Beach, Inc. [CBE 9; Tr. at 106:7–21.]

48. At the time of the challenged conveyances and transfers, the grantor, Horry Properties, was the holder of valid indebtedness to Cadence Bank in the amount of $816,355.00. [CBE 83, Tr. at 29:3–17.]

Existence of consideration

49. This Court finds that M&M Builders provided some consideration for the KFC Waffle House property and associated leases.

50. As to the KFC Waffle House property, as Cadence Bank itself acknowledged, M&M Builders not only made a promise to pay Horry Properties, but it assumed a pre-existing loan between Horry Properties and Horry County State Bank in the amount of $226,421.14.[8] [CBE 4, at 1, 16; Tr. at 112:6–12; Pl.'s Post-Trial Br., Doc. # 62, at 5.]

51. As to the associated leases, the assignment itself indicates that consideration was paid, and that in exchange for Horry Properties assigning the leases, M&M Builders would assume all duties under the leases. [CBE 9, at 2.] Further, Cadence Bank does not contest that M&M Builders assumed all duties under the leases. [*See* Tr. at 12:3–64:14, 196:12–199:16.]

Horry Properties had the actual intent of defrauding Cadence Bank

52. Although there was some consideration for the challenged conveyances, the following facts and circumstances in this case constitute badges of fraud on behalf of Horry Properties, and support this Court's finding that Cadence Bank has met its burden of proving by clear and convincing evidence that Horry Properties' transfer of the KFC/Waffle House property and associated leases

---

[8] A representative of Cadence Bank also testified that he had no reason to believe that M&M Builders did not pay some value for the KFC/Waffle House property. [Tr. at 56:21–57:5.]

were made with the actual intent of defrauding Cadence Bank. [*See* Findings of Fact ¶¶ 53–73.] The following badges of fraud are evident here:

(*Indebted and insolvent*)

53.    Horry Properties was heavily indebted in August 2008, when it sold the KFC/Waffle House property to M&M Buidlers, and assigned to M&M Builders the associated leases. [*See* CBE 83; Tr. at 29:3–17, 81:13–19.] By the August 2008 conveyances, Horry Properties had long since stopped making payments under the terms of the $816,355 Cadence Note, which was secured by the Deed of Trust on the Country Cottage property and the Undeveloped Lots. [CBE 74, 94; Tr. at 81:13–19.]

54.    Despite full knowledge of this debt and the fact that payments were not being made, Horry Properties' sole member, Mr. McLean, nonetheless transferred the KFC/Waffle House property and assigned the associated leases to M&M Builders. [Tr. at 81:13–19, 137:25–138:9.]

55.    Horry Properties  made itself effectively insolvent with the KFC/Waffle House transfer. Horry Properties' assets were the KFC/Waffle House property and associated leases, and the Country Cottage property and the Undeveloped Lots. [*See* CBE 60, at 2; Tr. at 43:11–13, 94:19-25.] By August 2008, Mr. McLean was aware that Horry Properties was in default to Cadence Bank on the Country Cottage property and the Undeveloped Lots, that the Country Cottage property and the Undeveloped Lots were subject to foreclosure, and that Horry Properties owed more on the Country Cottage property and the Undeveloped Lots than those properties would bring at a foreclosure sale. [CBE 94, 105, 108; Tr. at 81:13–19, 137:25–138:20, 179:13–180:7.] Accordingly, when, on behalf of Horry Properties, Mr. McLean transferred the KFC/Waffle House property and associated leases to M&M Builders, he not only purged from Horry Properties its only other asset, he did so knowing that Horry Properties would eventually be burdened with debts it could not pay. [*Id.*]

56.     Mr. McLean's testimony that he believed that a sale of the Country Cottage property and the Undeveloped Lots would cover any outstanding debt he had to Cadence Bank is neither credible nor supported by the record. [Tr. at 179:4–12.]

57.     First, prior to the sale of the KFC/Waffle House property and associated leases, the most recent appraisals Mr. McLean admitted receiving from Cadence Bank regarding the Country Cottage property and the Undeveloped Lots were from November 2007. [Tr. at 179:13–180:7.] These combined appraisals offered "as-is" values of approximately $615,000, and combined market values of approximately $785,000, while Horry Properties was indebted to Cadence Bank in the amount of $816,355. [Finding of Fact ¶ 36, 48; CBE 83, 105, 108.] Although Mr. McLean stated that he believed that Horry Properties' indebtedness to Cadence Bank was less than $816,355, he did admit that the indebtedness was at least $790,000. [Tr. 83:12–20.] By Mr. McLean's own testimony, at best, the challenged transfers placed Horry Properties in the position of owing debts that were greater than even the highest appraised value of its only remaining assets. [Tr. at 83:12–20, 179:13–180:7.]

58.     Second, Mr. McLean, who has sold more than 100 properties over a fifty-year career in real estate, would have known that by August 2008, the value of the Country Cottage property and the Undeveloped Lots was not only far less than the amount he owed to Cadence Bank, but likely significantly less than the appraisal performed in November 2007. [*See* Tr. at 75:5–11.]

- One, Mr. McLean acknowledged that, beginning in 2006 and continuing through 2008, the Country Cottage Restaurant and Bakery began to increasingly lose money and ceased being profitable. [Tr. at 167:3–168:15.] This is especially germane because an official from Cadence Bank testified that the $816,355 value of the loan it made to Horry Properties in 2005 was based upon the fact that Horry Properties was purchasing a profitable business. [Tr. at 13:18–14:12.]

17

- Two, in the beginning of 2008, Cadence offered Horry Properties additional requested funds, but only if Horry Properties agreed to pledge as collateral property worth more than the requested amount. [Tr. at 170:10–19.] This should have indicated to Horry Properties that the Country Cottage property and the Undeveloped Lots were no longer sufficient to satisfy the outstanding debt to Cadence Bank.

- Three, in January 2008, Horry Properties permanently closed the Country Cottage Restaurant and Bakery, ending any value it may have had as an ongoing business enterprise. [Tr. at 169:20–170:4.]

- Four, in approximately April 2008, Mr. McLean alleged that robbers broke into the Country Cottage Restaurant and Bakery and stole valuable restaurant equipment. [Tr. at 183:18–184:10.][9]

*(Pendency of litigation)*

59.   The Deed of Trust stated that failure to make payments on the Cadence Note constituted an event of default, and that upon default Cadence Bank had the right to bring a foreclosure action and sell the property. [CBE 94, at 6.] In 2007, Horry Properties and Cadence Bank entered into an agreement to extend the payment period under the Deed of Trust. [CBE 75; Tr. at 171:8–18, 20:21–24, 80:1–4.] Representatives from both Cadence Bank and Horry Properties testified that, aside from extending the payment time frame, the extension agreement in no way altered the terms of the Deed of Trust. [*Id.*]

60.   Horry Properties and Mr. McLean were involved in foreclosure litigation before and during the challenged August 2008 conveyances from Horry Properties to M&M Builders. [*See* CBE 68; Tr. at 83:3–86:25.]

---

[9]   Due in part to these negative changes, an October 2008 appraisal commissioned by Cadence Bank appraised the market value of the Country Cottage Restaurant and Bakery at $380,000, a $165,000 decrease from the 2007 appraisal of the same property. [CBE 104, 108; Tr. at 24:3–24:15.]

61.    Both Horry Properties and Mr. McLean had notice of the litigation at the time of the challenged conveyances. [Findings of Fact ¶¶ 11–21.]

(*Inadequate consideration*)

62.    The consideration paid by M&M Builders was grossly inadequate. [Findings of Fact ¶¶ 63–64.]

63.    Not only did Horry Properties receive no funds at closing, but M&M Builders, the purported purchaser, actually received $43,877.40 in cash. [CBE 16; Tr. at 111:18–25, 114:1–5.] Additionally, although the settlement statement referenced M&M Builders assuming a $321,155.50 loan, Mr. McLean could account for assumed loans only in the amount of approximately $253,000.  [CBE 4, 16; Tr. at 108:2–25, 112:6–12; 114:1–5.]

64.    M&M Builders also promised to pay Horry Properties $499,115.70, more than half the purchase price for the KFC/Waffle House, under the M&M Note, though no payments have been made under the note and none are due until 10 years after the transfer – on August 8, 2018. [CBE 51; Tr. at 115:2–14.] Further, Mr. McLean, controlling agent of M&M Builders and acting in his capacity as Horry Properties' sole member, assigned the M&M Note to himself, individually.  [CBE 51; Tr. at 115:24–116:1.] Accordingly, even when payments become due in ten years, those payments will be due to Mr. McLean individually, and not to Horry Properties. [*Id*.]

(*Additional badges of fraud*)

65.    There are several additional badges of fraud in this case. [Findings of Fact ¶¶ 66–70.]

66.    There was a close relationship between the transferor and the transferee, with the common denominator of both Horry Properties and M&M Builders being Mr. McLean. [Findings of Fact ¶¶ 5–6; CBE 1, 9, 16, 77; Tr. at 80:5–10, 101:12–17.]

67.     When Horry Properties transferred the KFC/Waffle House property and associated leases, it was effectively transferring its entire estate as it was conveying its only asset not under foreclosure. [Findings of Fact ¶¶ 53–58.]

68.     As Mr. McLean was the sole member of both Horry Properties and, at least, the controlling agent of M&M Builders, Horry Properties effectively retained control of the KFC/Waffle House property and associated leases. [*See* Findings of Fact ¶¶ 5–6; CBE 1, 9.]

69.     Horry Properties' transfer of the KFC/Waffle House property and associated leases to M&M Builders occurred a mere two months after the notice of foreclosure was served upon Horry Properties' registered agent [CBE 69, 79], and just four months prior to the foreclosure sale [CBE 1, 9, 91]. The Court finds the timing of these conveyances highly suspicious.

70.     Much of Mr. McLean's testimony was not credible or evasive. For example:

- When questioned about the settlement statement containing the details of the KFC/Waffle House property transfer, Mr. McLean, who had previously testified that he had a five-decade long real estate career that involved selling at least 100 properties, stated flatly, "I don't understand this form. I signed it because it was placed in front of me to sign." [Tr. at 75:5–11, 106:15–21.]

- Mr. McLean repeatedly sought to place blame in others: his daughter was wrong when she denied knowledge of a loan he claimed to owe her, and various lawyers and an accountant were responsible for numerous inconsistences and errors in tax filings and documents memorializing transactions engaged in by his various businesses, including Horry Properties and M&M Builders. [*See, e.g.*, Tr. at 114:21–115:1.]

- Although the settlement statement listed M&M Builders as assuming a loan in the amount of $321,155.50, the evidence and testimony in the record indicated an assumed loan only in the amount of approximately $226,000. [CBE 4, 16.] When questioned about this one hundred thousand dollar discrepancy, Mr. McLean said only that he "didn't prepare this. I just signed it." [Tr. at 112:6–12.] Additionally, Mr. McLean was unable to explain why the settlement statement stated that Horry Properties would provide seller-financing in the amount of $485,299.40, when the M&M Note memorializing this financing contained an amount of $499,115.70. [*See*

CBE 16, 51; Tr. at 114:18–22.] In fact, when asked how he came to the latter amount, Mr. McLean testified that he "didn't know." [Tr. at 114:21–115:1.]

Horry Properties' was indebted at the time of the transfer and its fraudulent intent is imputable to M&M Builders

71.    As this Court has discussed at length, Horry Properties' was indebted at the time of the transfer. [Findings of Fact ¶¶ 53–58.] Further, Horry Properties' intent to defraud Cadence Bank is imputable to M&M Builders. Mr. McLean was the sole member of Horry Properties, he was at least the controlling agent of M&M Builders, and he brokered the conveyances at issue. [*See* CBE 1, 9; Tr. at 80:5–10, 99:24–101:23.] Mr. McLean himself agreed that because of his status as "acting sole member" of each LLC, knowledge on behalf of Horry Properties would be imputed to M&M Builders. [Tr. at 138:10–20.]

72.    The overwhelming weight of evidence and testimony in this case shows that the transfer of the KFC/Waffle House property and assignment of the associated leases was made by Horry Properties with the actual intent of defrauding Cadence Bank, that Horry Properties was indebted at the time of the transfer, and that Horry Properties' intent is imputable to M&M Builders. [*See* Findings of Fact ¶¶ 53–71.] This was shown by clear and convincing evidence.

73.    For all of the above reasons, Cadence Bank has met its burden of proving by clear and convincing evidence that Horry Properties' transfer of the KFC/Waffle House property and assignment of the associated leases to M&M Builders constituted actual fraud and that these transfers and assignments should be set aside under S.C. Code Ann. § 27-23-10(A). [*See* Findings of Fact ¶¶ 53–72.]

Piercing the corporate veil

74.     The following facts and circumstances support the Court's finding that Cadence Bank has failed to meet its burden of establishing that Horry Properties and M&M Builders failed to observe corporate formalities and that it would be fundamentally unfair to recognize Horry Properties and M&M Builders as corporate entities. [*See* Findings of Fact ¶¶ 75–76.]

(*M&M Builders*)

75.     Cadence Bank has failed to meet its burden of proof that M&M Builders failed to observe corporate formalities or that it would be fundamentally unfair to recognize M&M Builders' corporate form. [*See* Findings of Fact ¶¶ 76–78.]

76.     M&M Builders was never indebted to Cadence Bank, nor does Cadence Bank have any outstanding judgments against M&M Builders. [*See* Tr. at 12:1–64:15.]

77.     There was little to no evidence presented by Cadence Bank that M&M Builders was undercapitalized, that there was siphoning of funds from M&M Builders, or that M&M Builders was a facade for anyone. [*See, e.g*., Tr. at 202:6–133:12; Pl.'s Post-Trial Br., Doc. # 62, at 8–12.]

78.     The limited testimony relating specifically to the corporate health of M&M Builders indicates that, while not a robust business, the company was, and is, operating and collecting rental income. [Tr. at 133:25–203:24.]

(*Horry Properties*)

79.     Although Cadence Bank has proven that Horry Properties committed fraud by transferring its only assets not under foreclosure [*see* Findings of Fact ¶¶ 53–73], Cadence Bank has failed to meet its burden of proof that fundamental fairness requires disregarding Horry Properties' corporate form. [*See* Findings of Fact ¶¶ 80–81.]

80.     Mr. McLean argued that because Cadence Bank dismissed the personal guaranty lawsuit with prejudice, Cadence Bank should be collaterally estopped from pursuing a veil piercing claim against Horry Properties. [Tr. at 207:5–24.] Cadence Bank's current cause of action of piercing the corporate veil is not premised upon the previously dismissed personal guaranty signed by Mr. McLean. [*See* Pl.'s Compl., Doc. # 1.] However, the veil piercing claim in this lawsuit seeks essentially the same relief as the claim Cadence Bank has already dismissed with prejudice: to hold Mr. McLean personally responsible for the $367,881.21 deficiency of Horry Properties. [*See* CBE 42; Tr. at 39:10–23; Pl.'s Compl., Doc. # 1.]

81.     The logical by-product of granting Cadence Bank's request to set aside the fraudulent conveyance is that Horry Properties now has assets to which Cadence Bank may attach its debt and ultimately recover on its judgment.[10] [*See* Findings of Fact ¶¶ 24, 53–73.]

## CONCLUSIONS OF LAW

**I.      Fraudulent conveyances**

In this case, Cadence Bank asks the Court to set aside the transfers between Horry Properties and M&M Builders, an equitable remedy. Alternatively, Cadence Bank asks for actual and punitive damages based on the defendants' fraudulent conduct, a legal remedy. Cadence Bank is not entitled

---

[10]  There was conflicting evidence in this case about the value of the KFC Waffle House Property and associate leases. In the fraudulent transfer, the contract price of the KFC/Waffle House asset was listed at $882,500.00. [CBE 47.] At a previous deposition, Mr. McLean testified that the value of the KFC/Waffle House asset was worth approximately $1.2 million. [CBE 91, at 12:2–19.] This valuation was based on a financial statement prepared by Mr. McLean. [*Id.*] During trial, Mr. McLean claimed he misunderstood the question during the deposition, and that the value of the KFC/Waffle House asset was closer to $600,000. [Tr. at 96:15– 97:18.] Other than this conflicting evidence and testimony, Cadence Bank presented no other evidence regarding the value of the KFC/Waffle House asset. Accordingly, while the value of the KFC/Waffle House asset cannot be readily determined, the evidence in this case indicated a value of the KFC/Waffle House asset as somewhere between $600,000 and $1.2 million.

to double recovery on its fraudulent conveyance claim and, as such, has informed the Court that it elects the equitable remedy of setting aside the challenged transfers under South Carolina's fraudulent conveyance statute, S.C. Code Ann. § 27-23-10(A). [*See* Tr. at 200:1–5; Pl.'s Post-Trial Br., Doc. # 62, at 8.]

> A.    South Carolina law governing fraudulent conveyances

South Carolina's fraudulent conveyance statute provides that:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10(A).

In turn, South Carolina case law interpreting § 27-23-10(A) establishes three distinct situations in which a fraudulent conveyance may be found. *See Coleman v. Daniel*, 261 S.C. 198, 207–208, 199 S.E.2d 74, 78–79 (1974); *Jeffords v. Berry*, 247 S.C. 347, 350–51, 147 S.E.2d 415, 417–418 (1966).

The first is "'where the transfer is made by the grantor with the actual intent of defrauding his creditors . . . even though there is a valuable consideration.'" *Jeffords*, 247 S.C. at 351, 147

24

S.E.2d 415. In these cases, the transfer will be set aside if the plaintiff can prove by *clear and convincing evidence*[11] that

> (1) the transfer was made by the grantor with the actual intent of defrauding his creditors; (2) the grantor was indebted at the time of the transfer; and (3) the grantor's intent is imputable to the grantee.

*Durham v. Blackard*, 313 S.C. 432, 437–38, 438 S.E.2d 259, 262 (Ct. App. 1993) (citing *Coleman*, 261 S.C. at 208, 199 S.E.2d at 79).

The second situation in which a fraudulent conveyance may be found is when there is no consideration. South Carolina courts explain the second situation as follows:

> [W]here the transfer was not made on a valuable consideration, no actual intent to hinder or delay creditors must be proven. Instead, as a matter of equity, the transfer will be set aside if the plaintiff shows[, by clear and convincing evidence,] that (1) the grantor was indebted to him at the time of the transfer; (2) the conveyance was voluntary [that is, without consideration]; and (3) the grantor failed to retain sufficient property to pay the indebtedness to the plaintiff in full-not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt.

---

[11] In Cadence Bank's proposed order sent to this Court, Cadence Bank appears to advocate that its burden of proof in this case might be by a preponderance of the evidence. However, South Carolina courts have long held that the burden of proof for showing actual or constructive fraud under South Carolina law is the clear and convincing evidence standard. *See, e.g.*, *First Union Nat'l v. Smith*, 314 S.C. 459, 445 S.E.2d 457, 459 (Ct. App. 1994) (applying clear and convincing standard in an action to set aside a fraudulent conveyance); *Hagy v. Pruitt*, 339 S.C. 425, 432, 529 S.E.2d 714, 718 (2000) (holding that in fraud cases, which sound in equity, the party asserting fraud has the burden of proving such fraud by clear and convincing evidence); *see also Cmty. Bank of Miss. v. Carson*, C.A. No. 6:08-03758-JMC, 2010 WL 3825388, at *4 (D.S.C. Sept. 23, 2010) (applying South Carolina law and imposing a burden of clear and convincing evidence on transferee in an action to set aside fraudulent intra-family transfer); *In re J.R. Deans Co., Inc.*, 249 B.R. 121, 134 (Bankr. D.S.C. 2000) (applying South Carolina law and imposing a burden of clear and convincing evidence on plaintiff in an action to set aside fraudulent non-intra-family transfer).

*Durham*, 313 S.C. at 437, 438 S.E.2d at 262 (Ct. App.1993) (citing *Coleman*, 261 S.C. at 208, 199 S.E.2d at 79).

The third situation involves those cases in which property is conveyed between family members, in which case the burden of proof shifts from the plaintiff to the transferee. *See Coleman*, 261 S.C. at 208, 199 S.E.2d at 79. Specifically,

> '[w]here transfers to members of the family are attacked either upon the ground of actual fraud or on account of [lack of consideration], the law imposes the burden on the transferee to establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony.'

*Id.* (quoting *Gardner v. Kirven*, 184 S.C. 37, 37, 191 S.E. 814, 816 (1937)). *See, e.g., Windsor Props., Inc. v. Dolphin Head Const. Co., Inc*., 331 S.C. 466, 472, 498 S.E.2d 858, 860-61 (1998) (holding that the transfer of property from corporation, wholly owned by husband, to a wife in her individual capacity violated fraudulent conveyance statute, in absence of wife proving by clear and convincing evidence that transfer was for consideration and was bona fide).

> B.    Cadence Bank must prove that the transfers in this case constituted actual fraud

Mindful of the three different situations under which a fraudulent transaction may arise, this Court must initially determine the applicable legal framework under which to analyze the fraudulent conveyances at issue in this case.

Because this situation does not concern an intra-family transfer, Cadence Bank bears the burden of proof under any other applicable situation.[12] Here, Cadence Bank contends that Horry

---

[12]  Cadence Bank never directly argued that the transactions from Horry Properties to M&M Builders constituted an intra-family transfer. Additionally, even if this Court were to accept Mr. McLean's argument that the transferees were ultimately his children, this would at most have the effect of shifting the burden of proof from Cadence Bank to M&M Builders – essentially making it easier for Cadence Bank to prevail on their actual fraud claim. *See Coleman*, 261 S.C. at 208, 199 S.E.2d at 79.

Properties' transfer of the KFC/Waffle House and the assignment of the associated leases to M&M Builders should be set aside because these transactions lacked consideration and because the transactions constituted actual fraud. [*See* Tr. at 202:2–25; Pl.'s Post-Trial Br., Doc. # 62, at 4.]

As an initial matter, this Court rejects Cadence Bank's argument that the transactions lacked consideration for purposes of a fraudulent transfer analysis. [*See* Findings of Fact ¶¶ 49–51.] According to the S.C. Supreme Court, "valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit, accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." *Univ. v. Waller*, 124 S.C. 68, 74, 117 S.E. 356, 358 (1923); *see also Ahrens v. State*, 709 S.E.2d 54, 64, 392 S.C. 340, 360 (2011) (Hearn, J., concurring); *McLeod v. Sandy Island Corp*., 265 S.C. 1, 13, 216 S.E.2d 746, 751 (1975).

Cadence Bank correctly points out, and Defendants concede, that Horry Properties received no funds when it conveyed the KFC/Waffle House property. [Tr. at 113:22–114:5; Pl.'s Post-Trial Br., Doc. # 62, at 6.] However, M&M Builders did make a promise to pay Horry Properties at some point in the future, and the record shows that M&M Builders assumed pre-existing indebtedness. [*See* Findings of Fact ¶¶ 50–51.] Although this consideration may have been inadequate [*see* Findings of Fact ¶¶ 62–64], M&M Builders provided *some* benefit to Horry Properties in exchange for the KFC/Waffle House property – namely a promise to pay money in the future and assumption of an existing mortgage. As the South Carolina Supreme Court has explained:

> '[G]rossly inadequate" consideration is 'a strong badge of fraud' but we specifically reject[] the argument that gross inadequacy of consideration reduces the conveyance to the status of one made without consideration, . . . 'gross inadequacy of consideration and 'without consideration' are not synonymous in the law.' . . . [W]here

> there is gross inadequacy of consideration, an actual intent to defraud
> must still be shown to set aside the conveyance as fraudulent.

*Royal Z Lanes, Inc. v. Collins Holding Corp.*, 337 S.C. 592, 595, 524 S.E.2d 621, 622 (1999) (citing

*Jeffords*, 247 S.C. at 352, 147 S.E.2d at 418).

      To the extent the assignment of leases associated with the KFC/Waffle House property are

treated as a separate transfer, this transfer also had *some* consideration by way of an assumption of

the duties under the leases.[13] [*See* Finding of Fact ¶ 51.] South Carolina law has long recognized that

an assignee of a contract, who acquires the right to enforce its provisions, "assumes the burdens

which are imposed . . . by the contract [as] consideration . . . ." *Welling v. Crosland*, 129 S.C. 127,

128, 123 S.E. 776, 780 (1924); *see, e.g.*, *Joyner v. Greenville Hotel Assocs. Ltd. P'ship*, 364 S.C.

237, 242, 612 S.E.2d 727, 729 (Ct. App. 2005) (noting that for a lease assignment to be valid, the

party receiving such an assignment must agree to be bound by its terms).

      Therefore, this Court cannot say that Cadence Bank has proved by clear and convincing

evidence that either the KFC/Waffle House property transfer or the assignment of the associated

leases were without consideration. Accordingly, in order for the transfers to be set aside, Cadence

Bank must show, by clear and convincing evidence, that Horry Properties made the challenged

---

[13]  The transfer of the KFC/Waffle House property occurred on August 8, 2008, while the
transfer of the associated leases occurred via a separate document on August 22, 2008.
[CBE 1, 9.] Further, the general warranty deed outlining the KFC/Waffle House property
transfer indicated that such transfer was "subject to [the] assignments . . . ." [CBE 1, at 1.]
However, Mr. McLean testified that the leases were transferred in connection with the sale
of the KFC/Waffle House property. [*See* Tr. at 104:17–105:9 ("[I]f you sell the property, the
leases pretty well go with it, don't it?").] In any event, this is ultimately a distinction
without a difference. Both transactions are subject to the actual fraud standard, both
transactions involved the same parties, and the same fraudulent conduct permeated both
transfers. [*See* Findings of Fact ¶¶ 52–73.]

transfers with the actual intent of defrauding Cadence Bank and otherwise satisfy the "first situation" explained at pages 24–25 of this Order.

    <u>C.</u>    <u>The conveyances at issue should be set aside on the basis of actual fraud</u>

To set aside the conveyances on the basis of actual fraud, Cadence Bank must prove by clear and convincing evidence that (1) the transfers were made by Horry Properties with the actual intent of defrauding Cadence Bank; (2) Horry Properties was indebted at the time of the transfer; and (3) Horry Properties intent is imputable to M&M Builders. *See Durham*, 313 S.C. at 437–38, 438 S.E.2d at 262. Cadence Bank meets its burden of proof as to each of these three elements.

    <u>1.</u>    <u>Horry Properties intended to defraud Cadence Bank</u>

Where a plaintiff seeks to set aside a conveyance on the basis of intent to defraud, fraudulent intent "can usually be shown only by a consideration of the attendant facts and circumstances, a resort to which must usually be had in order to distinguish between transactions which are bona fide, and those which are not." *Coleman*, 261 S.C. at 209, 199 S.E.2d at 79 (internal citations omitted).

"Certain circumstances so frequently attend conveyances to defraud creditors that they are recognized and referred to as 'badges of fraud'." *Id.* Unexplained "badges of fraud" may warrant an inference of fraud in certain cases. *Id*. "Whether the inference is warranted depends in large measure on whether a satisfactory explanation is presented." *Id*.

    <u>i.</u>    <u>This case presents several enumerated badges of fraud</u>

South Carolina courts recognize the following badges of fraud, although this list is not exclusive:

> 1) the insolvency or indebtedness of the transferor; 2) lack of, or grossly inadequate, consideration for the conveyance; 3) close relationship between the transferor and the transferee; 4) the pendency or threat of litigation; 5) secrecy or concealment; 6)

departure from the usual method of business; 7) the transfer of the debtor's entire estate; 8) the reservation of benefit to the transferor; and 9) the retention by the debtor of possession or control of the property.

*Id*.; *see also Royal Z Lanes, Inc.*, 337 S.C. at 595–96, 524 S.E.2d at 622–23.

Although a transaction can be fraudulent though it evidences only a single badge of fraud, "it is more generally held that while one circumstance recognized as a badge of fraud may not alone prove fraud, where there is a concurrence of several such badges of fraud an inference of fraud may be warranted." *Coleman*, 261 S.C. at 209–210, 199 S.E.2d at 79–80 (quoting 37 Am. Jur. (2d), Fraudulent Conveyances, § 10 (1968)). "A badge of fraud creates a rebuttable presumption of intent to defraud." *Royal Z Lanes, Inc.*, 337 S.C. at 596, 524 S.E.2d at 623.

As discussed more fully in this Court's Findings of Fact, this case presents many of the badges of fraud specifically delineated by the South Carolina Supreme Court.

(1)     **Horry Properties was indebted and made itself insolvent**. [*See* Findings of Fact ¶¶ 53–58.] Horry Properties' actions of selling off its remaining viable asset, in the face of heavy debt and foreclosure, creates a strong badge of fraud. *See Coleman*, 261 S.C. at 209–210, 199 S.E.2d at 79–80. Horry Properties' only real effort to rebut this conclusion comes by way of Mr. McLean's testimony that he believed that a sale of the Country Cottage property and Undeveloped Lots in August 2008 would cover any outstanding debt he had to Cadence Bank. [*See* Finding of Fact ¶ 56; Tr. at 179:4–12.] However, as noted in this Court's Findings of Fact, Mr. McLean admitted that he owed more than the property's 2007 appraised value, the most recent appraisal he admitted seeing prior to the August 2008 sale, and that numerous circumstances were causing the property's value to decline. [*See* Findings of Fact ¶¶

57–58.] It strains credulity to think that Mr. McLean, who has sold more than 100 properties over a fifty-year career in real estate, would believe that in August 2008, the Country Cottage property and the Undeveloped Lots were worth more than he owed Cadence Bank, especially given an appraisal to the contrary and a plethora of circumstances negatively affecting the property values since that appraisal.

(2) **The conveyances at issue were made during the pendency of litigation, and both Horry Properties and Mr. McLean had notice of the litigation**. [*See* Findings of Fact ¶¶ 59–61.] *See also McCall v. IKON*, 363 S.C. 646, 654, 611 S.E.2d 315, 318–19 ( Ct. App. 2005) (holding that a company receives notice when its registered agent is served). Even if this Court were to accept that Mr. McLean was unaware of the actual ongoing litigation, which it does not, Mr. McLean admitted that because he had made no payments to Cadence Bank, he was aware that foreclosure was a very real possibility. [Tr. at 138:4–20.] Accordingly, at a minimum Mr. McLean would have been acutely aware of the threat of litigation, which is also a recognized badge of fraud under South Carolina law. *See Coleman*, 261 S.C. at 209, 199 S.E.2d at 79.

(3) **Horry Properties received grossly inadequate consideration**. [*See* Findings of Fact ¶¶ 62–64.] *See also Jeffords*, 247 S.C. at 352, 147 S.E.2d at 418 (explaining that consideration is grossly inadequate when it falls "far short of the value of the property"). The evidence offered by Defendants did nothing to rebut this conclusion. Even if the consideration were adequate, the other badges of fraud in this case would be enough for this Court to set aside the challenged transfer and assignments.

31

(4) **By virtue of Mr. McLean's relationship to, and control over, both Horry Properties and M&M Builders, there was a close relationship between the entities and Horry Properties effectively retained control of the KFC/Waffle House property and associated leases**. [*See* Findings of Fact ¶¶ 66, 68.]

(5) **Horry Properties effectively transferred its entire estate**. [*See* Finding of Fact ¶ 67.]

<u>ii.</u>  <u>Several other badges of fraud are present in this case</u>

South Carolina courts have also held that any given case could present badges of fraud separate and apart from those specifically enumerated in South Carolina case law. *Coleman*, 261 S.C. at 209, 199 S.E.2d at 79. In this case, there are other "attendant facts and circumstances" which distinguishes the fraudulent conveyances here from "bona fide" transactions. *Id*. First, the timing of Horry Properties' transfer of the KFC/Waffle House property and associated leases to M&M Builders – just after the foreclosure litigation commenced and just before the foreclosure sale – is highly suspicious. [*See* Finding of Fact ¶ 69.] Second, Mr. McLean's testimony was no credible and at times evasive. [*See* Finding of Fact ¶ 70.]

The testimony and other evidence in this case plainly establishes multiple "badges of fraud," and create a strong presumption of intent to defraud. As discussed above, the testimony and other evidence presented by Defendants did not rebut that evidence . *See Royal Z Lanes, Inc.*, 337 S.C. at 596, 524 S.E.2d at 623. Cadence Bank has thus proven by clear and convincing evidence that Horry Properties transferred the KFC/Waffle House property and assigned the associated leases to M&M Builders with the actual intent to defraud Cadence Bank.

### 2. Horry Properties was indebted at the time of the transfer, and its intent to defraud it imputable to M&M Builders

In order to set aside the conveyance of the KFC/Waffle House property and associated leases, Cadence Bank must also prove by clear and convincing evidence that Horry Properties was indebted at the time of the transfer, and that Horry Properties' intent is imputable to M&M Builders. *See Durham*, 313 S.C. at 437–38, 438 S.E.2d at 262.

Cadence Bank easily meets its burden of proof as to these last two elements.

First, as this Court has thoroughly discussed, Horry Properties was indebted to Cadence Bank at the time of the challenged transfers. [*See* Findings of Fact ¶¶ 53–58.] Second, Horry Properties' intent is plainly imputable to M&M Builders, as Mr. McLean was the sole member of Horry Properties, was at least the controlling agent of M&M Builders, and brokered the conveyances at issue. [*See* Finding of Fact ¶ 71.]

Therefore, given that the overwhelming weight of evidence and testimony in this case shows that it is highly and substantially probable that Horry Properties transferred the KFC/Waffle House property and assigned the associated leases with the actual intent of defrauding Cadence Bank, Cadence Bank has proven by clear and convincing evidence that the transfer and assignments should be set aside under S.C. Code Ann. § 27-23-10(A). *See Jeffords*, 247 S.C. at 351, 147 S.E.2d 415.

## II. Piercing the Corporate Veil

Cadence Bank also requests that this Court pierce the corporate veil as to Horry Properties and M&M Builders, and hold Mr. McLean personally liable for their debts and obligations. For the reasons discussed below, Cadence Bank fails to meet its burden of establishing that the corporate entities should be disregarded.

A.     Legal standard governing piercing the corporate veil

A limited liability company, like a corporation, is an entity, separate and distinct from its members and its debts are not the individual indebtedness of its members. S.C. Code Ann. § 33-44-201; *see also DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976). In general, equitable principles govern the veil-piercing remedy, and "[i]t is settled authority that the doctrine of piercing the corporate veil is not to be applied without substantial reflection." *Sturkie v. Sifly*, 280 S.C. 453, 457, 313 S.E.2d 316, 318 (Ct. App. 1984). "The corporate form may be disregarded only where equity requires the action to assist a third party." *Woodside v. Woodside*, 290 S.C. 366, 370, 350 S.E.2d 407, 410 (Ct. App. 1986).

"If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons." *Sturkie*, 280 S.C. at 457, 313 S.E.2d at 318. The party seeking to pierce the corporate veil has the burden of proving that the doctrine should be applied. *Id*.

In *Sturkie*, the South Carolina Court of Appeals set forth a two-pronged test to determine whether to pierce the corporate veil. *Sturkie*, 280 S.C. at 457, 313 S.E.2d at 318. The first prong involves an eight factor analysis that looks to the observance of corporate formalities. *Id*. The eight factors relative to the first prong are: 1) whether the corporation was grossly undercapitalized; 2) failure to observe corporate formalities; 3) non-payment of dividends; 4) insolvency of the debtor corporation at the time; 5) siphoning of funds of the corporation by the dominant stockholder; 6) non-functioning of other officers or other directors; 7) absence of corporate records; and 8) the fact

that the corporation was merely a facade for the operations of the dominant stockholder. *Dumas v. InfoSafe Corp.*, 320 S.C. 188, 192-193, 463 S.E.2d 641, 644 (Ct. App. 1995).

The advent of the statutory "S" corporation and limited liability companies has diminished the importance of some of the factors associated with traditional corporate governance. *See Hunting v. Elders*, 359 S.C. 217, 224, 597 S.E.2d 803, 807-08 (Ct. App. 2004). The *Sturkie* factors that now have less importance include the failure to observe corporate formalities, nonfunctioning of other officers or other directors, the absence of corporate records and the nonpayment of dividends. *Id.* The inquiry now primarily concerns the closely related factors dealing with undercapitalization, siphoning of funds, and whether the corporation was a facade for its dominant shareholder. *Id.*

The second prong considers whether the party seeking to pierce the corporate veil would suffer injustice or fundamental unfairness if the acts of the corporation are not regarded as acts of the individuals. *Sturkie*, 280 S.C. at 457, 313 S.E.2d at 318. "The essence of the fairness test is simply that an individual businessman cannot be allowed to hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell." *Dumas*, 320 S.C. at 192-193, 463 S.E.2d at 644.

> **B.** Cadence Bank has made no showing that veil piercing is appropriate as to M&M Builders

As an initial matter, this Court holds that Cadence Bank has failed to allege a viable claim to disregard M&M Builders' corporate form.

First, Cadence Bank has failed to meet its burden of proof that M&M Builders was undercapitalized, that funds were being siphoned, or that M&M Builders was a facade for anyone. [*See* Findings of Fact ¶¶ 77–78.] *See also Hunting,* 359 S.C. at 224, 597 S.E.2d at 807-08. The evidence in this case that focused on corporate formalities related primarily to Horry Properties.

[*See, e.g.*, Tr. at 202:6–133:12; Pl.'s Post-Trial Br., Doc. # 62, at 8–12.] In fact, the evidence in the record relating to M&M Builders tends to show that M&M Builders was capitalized and operating. [*See* Finding of Fact ¶ 78.]

Second, Cadence Bank has made no showing that it would suffer fundamental unfairness if M&M Builders' corporate form is not disregarded. *See Sturkie*, 280 S.C. at 457, 313 S.E.2d at 318. M&M Builders was never a debtor to Cadence Bank. [*See* Finding of Fact ¶ 76.] Additionally, this Court is setting aside the August 2008 transfer of property and assignment of leases from Horry Properties to M&M Builders, the August 2008 transactions are the only conveyances challenged by Cadence Bank, and M&M Builders' sole reason for being named a party in this lawsuit was that it accepted the conveyances. [*See, e.g.*, Tr. at 12:1–64:15; Pl.'s Compl., Doc. # 1.] Therefore, even assuming that Cadence Bank's allegations against M&M Builders were true, Cadence Bank cannot show that it would suffer injustice if this Court fails to pierce M&M Builders' corporate veil.

C.      Disregarding the corporate form of Horry Properties would be inequitable

This Court reiterates that, as a threshold matter, it may only disregard the corporate form of Horry Properties where "*equity requires* the action to assist a third party." *Woodside*, 290 S.C. at 370, 350 S.E.2d at 410 (emphasis added). Here, although the issue of whether to disregard Horry Properties' corporate form is a closer call, this Court holds that equity requires maintaining the corporate form of Horry Properties.

On August 17, 2009, Cadence Bank filed suit in a North Carolina federal court against Horry Properties, Mr. McLean, and his wife Elizabeth A. McLean to collect on the outstanding foreclosure deficiency. [Finding of Fact ¶ 24.] Mr. and Mrs. McLean were included in the lawsuit because they had each signed a personal guaranty on the loan with Cadence Bank. [Finding of Fact ¶ 8.] However,

on December 30, 2010, Cadence Bank dismissed its personal guaranty claim against Mr. And Mrs. McLean with prejudice, and Cadence Bank's representative did not elaborate as to why Cadence Bank chose to forever dismiss this claim. [Finding of Fact ¶ 26.]

Although the cause of action seeking to disregard the corporate form is not premised upon the dismissed personal guaranty, piercing the corporate veil in this case would ultimately have the very real effect of providing Cadence Bank a back door through which to pursue such a claim (holding Mr. McLean personally liable for Horry Properties' deficiency), which it chose to dismiss *with prejudice.* Given that piercing the corporate veil is a remedy which should be cautiously applied, coupled with the burden of proof placed upon Cadence Bank, it would not serve "substantial justice" or equity to disregard the corporate form under the specific circumstances of this case. *See Drury Dev. Corp. v. Found. Ins. Co.*, 380 S.C. 97, 102, 668 S.E.2d 798, 801 (2008) ("South Carolina courts have long observed that equity looks beneath rigid rules of law to seek substantial justice.").

D.    Cadence Bank's veil piercing claim as to Horry Properties fails under *Sturkie*

Applying the *Sturkie* factors to this case also shows that Cadence Bank has failed to meet its burden of proof that this Court should disregard the corporate form of Horry Properties.

This Court acknowledges that Cadence Bank has proven that Horry Properties committed fraud by transferring its only profitable assets while facing foreclosure on its remaining properties. [Findings of Fact ¶¶ 53–73.] This Court further acknowledges that, under *Sturkie*, fraud is often used to justify piercing the corporate veil. *See Sturkie*, 280 S.C. at 457, 313 S.E.2d at 318. However, even assuming that Cadence Bank has met its burden of proof as to the first prong of *Sturkie*, Cadence Bank has failed to meet the second prong of *Sturkie*.

In light of Cadence Bank's opportunity to seek a judgment on the guaranty by Mr. McLean, and Cadence's dismissal with prejudice of such, it seems strained to argue that Cadence Bank should now be allowed to pierce the corporate veil because it would suffer "injustice" or "fundamental unfairness." Additionally, because this Court is setting aside the fraudulent transfers from Horry Properties to M&M Builders, Horry Properties will now have in its possession the KFC/Waffle House property and associated leases. Further, Cadence Bank has filed a *Lis Pendens* regarding that very property. Accordingly, Cadence Bank can now seek to recover its debts from Horry Properties. [Finding of Fact ¶ 81.] It is difficult to see how Cadence Bank would suffer fundamental unfairness or injustice if Mr. McLean is not also held personally liable on Horry Properties' debt now that Horry Properties has assets which Cadence Bank can reach as a result of this Court's Order. Cadence Bank has thus failed to carry its burden of proof that it would suffer fundamental unfairness unless this Court disregards Horry Properties' corporate form.

## Conclusion

Because Cadence Bank has met its burden of proving by clear and convincing evidence that Horry Properties transferred the KFC/Waffle House property and assigned the associated leases to M&M Builders with the actual intent of defrauding Cadence Bank, the transfer and assignments are hereby declared null and utterly void and set aside. However, because Cadence Bank has failed to meet its burden of proving that the corporate veil should be pierced as to Horry Properties and M&M Builders, Mr. McLean is not personally liable for the obligations of those entities.

Based on the foregoing, it is **ORDERED** that judgment shall be entered in favor of Cadence Bank on its first cause of action for fraudulent transfer, and that judgment shall be entered in favor of Defendants on Plaintiff Cadence Bank's second cause of action of piercing the corporate veil.

**IT IS FURTHER ORDERED** that on Cadence Bank's claim to set aside the transfer of property and assignment of leases between Horry Properties and M&M Builders as fraudulent under S.C. Code Ann. § 27-23-10(A), the Court finds in favor of Cadence Bank and orders the following:

(1) The General Warranty Deed executed by Horry Properties, LLC in favor of M&M Builders, LLC of OD on August 8, 2008 [*see* CBE 1], and recorded in Deed Book 3356, Page 2689 of the Horry County Register of Deeds, is hereby set aside and declared utterly void under S.C. Code Ann. § 27-23-10(A).

(2) The Assignment of Leases executed by Horry Properties, LLC in favor of M&M Builders, LLC of OD on August 22, 2008 [*see* CBE 9], and recorded in Deed Book 3409, Page 2482 of the Horry County Register of Deeds, is hereby set aside and declared utterly void under S.C. Code Ann. § 27-23-10(A).

(3) The Clerk of the U.S. District Court shall forward a certified copy of this Order to the Clerk of Court for Horry County and the Horry County Registrar of Deeds for filing so as to notify them of this Court's determination that the above transfer and assignment of leases are null and utterly void, and for notice and recording purposes so that the Deed and Assignment of Leases may be cancelled.

(4) The Clerk of Court for Horry County and/or the Horry County Registrar of Deeds are **ORDERED** to cancel the Deed and Assignment of Leases described in Paragraphs (1) and (2) above.

**IT IS FURTHER ORDERED** that on Cadence Bank's claim to pierce the corporate veils of Horry Properties and M&M Builders, the Court finds in favor of Defendants, and the corporate forms of Horry Properties and M&M Builders will not be disregarded.

**IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
April 2, 2012